UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | 15 Crim. 292 (PGG) |
| ALEXANDER CATAÑO ARAGON, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | Judge Gardephe |

DECLARATION OF EUGENE R. FIDELL

| | | |
|---|---|---|
| State of New York | ) | |
| | ) | *ss.*: |
| County of New York | ) | |

1. My name is Eugene R. Fidell. I make this declaration at the request of defense counsel in the above-captioned case.

2. I am admitted to practice in New York, Connecticut and the District of Columbia. I graduated from Queens College in 1965 and from Harvard Law School in 1968.

3. Since 2009 I have taught full-time at Yale Law School, where I am Florence Rogatz Visiting Lecturer in Law and a Senior Research Scholar in Law. I have also taught at Harvard Law School and American University's Washington College of Law. Among the courses I have taught at Yale Law School are Law of the Sea and Admiralty.

4. I am also of counsel to the Washington, DC firm Feldesman Tucker Leifer Fidell LLP.

5. From 1969 to 1972 I served in the United States Coast Guard as a law specialist (judge advocate). I graduated from Officer Candidate School, Yorktown, Virginia, in 1969. My duty stations included the Marine Inspection Office, Los Angeles/Long Beach, California; the First Coast Guard District Legal Office, Boston; and Coast Guard Headquarters, Washington, DC.

6. At Coast Guard Headquarters I was Assistant and Acting Chief of the Maritime Laws and Treaties Branch, Search and Rescue Division, in the Office of Operations.

7. That branch's responsibilities included oversight of the Coast Guard's high seas maritime law enforcement mission, including issues relating to the boarding, inspection and seizure of foreign vessels, the conduct of interrogations, and hot pursuit.

8. I was awarded the Coast Guard Commendation Medal for my performance of duty in the Maritime Laws and Treaties Branch.

9. I left active duty as a Lieutenant and was promoted several years later to Lieutenant Commander.

10. I have written a number of articles for law reviews and naval-oriented publications concerning maritime law enforcement. *E.g.*, *The Coast Guard and Fisheries Law Enforcement*, 102 NAVAL INST. PROC. 70 (1976); *Fisheries Legislation: Naval Enforcement*, 3 J. MAR. L. & COM. 351 (1976); *Hot Pursuit From a Fisheries Zone*, 70 AM. J. INT'L L. 95 (1976); *Enforcement of the*

*Fisheries Conservation and Management Act of 1976: The Policeman's Lot*, 52
WASH. L. REV. 513 (1977).

11. I was a member of the Board of Editors of the *Journal of Maritime Law and
Commerce* from 1978 to 1990. From 2012 to 2014 I was a member of the
Department of Defense's Defense Legal Policy Board.

12. I submitted an expert declaration in *United States v. Prado*, Dkt. No. 15-cr-
455 (JSR), 2015 U.S. Dist. LEXIS 146253 (S.D.N.Y. Oct. 28, 2015), *appeal
docketed*, No. 16-1055 (2d Cir. filed Apr. 7, 2016).

13. I have examined the complaint, the indictment, the April 28, 2015
certification by Commander Gregory M. Tozzi, USCG, records relating to
interaction between the Eleventh Coast Guard District and the Ecuadorean
Coast Guard Operations Center (Forms 1, 2 and 3), a law enforcement case
package checklist, and a video clip that I understand was taken from a U.S.
Navy SH-60B Sea Hawk helicopter belonging to Helicopter Anti-Submarine
(Light) Squadron 60 and launched from the now-decommissioned 453-foot
*Oliver Hazard Perry*-class guided missile frigate USS *Kauffman* (FFG-59).

14. This declaration addresses three issues. The first is whether a flag painted on
the hull is sufficient to evidence a vessel's nationality so as to negate a claim
of statelessness. The second concerns application of the right of visit under
the law of the sea. The third concerns the scuttling of M/V *El Vacan*, the
vessel on which the defendant was found at the time of his arrest.

15. In conducting my research, I have taken into account the Third UN Convention on the Law of the Sea ("UNCLOS") (relevant provisions of which the United States treats as customary international law), other treaties, general maritime law, publicly available U.S. Navy and U.S. Coast Guard Regulations, and other pertinent domestic laws and regulations.

## A Flag May Be Displayed on the Hull

16. A vessel may indicate its nationality by having its flag State's national "colors" (flag) displayed by painting or affixing it in a visible place on the hull (*i.e.*, above the waterline).

17. I know of no authority for the proposition that a vessel such as M/V *El Vacan* must display, let alone literally "fly," the flag of the State whose nationality it has.

18. When maritime regulations refer to "flag flying," the phrase is not meant literally but, instead, refers to some form of public display of a State's flag.

19. UNCLOS Articles 91 ("Nationality of ships") and 92 ("Status of ships") refer to the "flying" of national flags by ships.

20. Article 91 provides:

> (1) Every state shall fix the conditions for the grant of its nationality to ships, for the registration of ships in its territory, and for the right to fly its flag. Ships have the nationality of the state whose flag they are entitled to fly. There must exist a genuine link between the State and the ship.

> (2) Every State shall issue to ships to which it has granted the right to fly its flag documents to that effect.

4

21. Article 92 provides:

> (1) Ships shall sail under the flag of one State only and ... shall
> be subject to its exclusive jurisdiction on the high seas. A
> ship may not change its flag during a voyage or while in a
> port of call, save in the case of a real transfer of ownership or
> change of registry.

> (2) A ship which sails under the flags or two of more States,
> using them according to convenience, may not claim any of
> the nationalities in question with respect to any other State,
> and may be assimilated to a ship without nationality.

22. These provisions codify *mare liberum* and reflect the principle that ships generally are subject to the exclusive jurisdiction and authority of their flag State. They are pertinent to "the right of visit," an international maritime law doctrine codified in Article 110 of the Convention, which sets forth when a warship may hail and board an unidentified vessel to ascertain its nationality. Where there are reasonable grounds for suspecting that a vessel is without nationality, the warship may conduct a boarding.

23. These provisions do not require a vessel to literally fly its nation's (fabric) flag in order to avoid being treated as stateless.

24. The closest they come to addressing "flag flying" is the first sentence of Article 92(1), "a ship may fly the flag of only one State at a time," but that language does not demand that a ship fly a flag at all.

25. Article 92 does not discuss a vessel "flying" its State's flag at all. Instead, it refers to ships that *sail* under a flag. When UNCLOS was negotiated, commercial vessels were typically motor vessels rather than sailing ships, although there of course were some number of smaller sailing vessels in trade,

many and perhaps most of which had auxiliary power. The Convention's use of the word "sail" as a verb therefore strongly suggests that it was not intended to be read literally. In my opinion, the same may be said of the use of the word "fly" as a verb in Articles 91-92 and 110(1)(d). M/V *El Vacan* was not a sailing vessel. As depicted in the video shot from USS *Kauffman*'s helicopter, *El Vacan* was powered by two large outboard motors.

26. That a vessel may indicate its nationality by means other than "flying" a flag aloft is confirmed by United States practice with respect to its own naval and law enforcement vessels as well as the regulation of privately-owned American watercraft.

27. The nationality of a naval or law enforcement vessel must be knowable at a distance so that those aboard other vessels may know whether they must heave to when ordered and submit to boarding. With respect to the display of national flags, maritime law does not impose the same duties on the vessel to be boarded and the naval or law enforcement vessel that proposes to conduct a boarding.

28. Naval and law enforcement vessels are not required to "fly" their State's flag. Instead, government vessels and aircraft that are employed in the suppression of piracy or seek to exercise the right of hot pursuit or the right of visit must be "clearly marked and identifiable as being on government service" under Articles 107, 110(5), and 111(5).

29. Similarly, under Article 29, warships permitted to exercise the right of hot pursuit need not "fly" their nations' flags. All that is required is that they "bear[] the external marks distinguishing such ships of its nationality."

30. To satisfy the requirement to be "clearly marked and identifiable as being on government service" or to "bear[] [ ] external marks," many States paint the words "Coast Guard" in English or the national language prominently on the hulls of their law enforcement vessels, and employ the familiar "racing stripe." *E.g.*, 33 C.F.R. § 23.12. Examples follow in these images:













31. The display of colors by U.S. Navy ships such as USS *Kauffman* and U.S. Coast Guard cutters is governed by service regulations. These regulations do not require that these vessels literally "fly" the United States flag at all times.

32. Chapter 12, Article 1259(4) of *U.S. Navy Regulations 1990, available at* http://doni.documentservices.dla.mil/US%20Navy%20Regulations/Chapter %2012%20%20Flags,%20Pennants,%20Honors,%20Ceremonies%20and%2 0Customs.pdf, provides:

> 4. The national ensign shall be displayed during daylight from the gaff (or from the triatic stay in the case of those ships with mast-mounted booms and stays which would interfere with the hoisting, lowering or flying of the ensign) of a ship under way under the following circumstances, unless or as otherwise directed by the senior officer present:
>
>> a. Getting underway or mooring/anchoring.
>> b. Falling in with other ships.
>> c. Cruising near land.
>> d. During battle.

33. *U.S. Coast Guard Regulations 1992, available at* https://www.uscg.mil/directives/cim/5000-5999/CIM_5000_3B.pdf, are to the same general effect. They provide in § 14-8-3(C):

> The national ensign shall be displayed during daylight from the gaff of a cutter underway under the following circumstances unless otherwise directed by the senior officer present:
>
>> (1) getting underway and coming to anchor.
>> (2) Falling in with other ships.
>> (3) Cruising near land.
>> (4) During battle.
>> (5) As required to comply with Section 14-8-6 [concerning dipping the national ensign in salute].

34. As far as I am aware, none of the circumstances enumerated in Navy or Coast Guard Regulations obtained at the time M/V *El Vacan* was boarded. As a result, USS *Kauffman* had no duty at the time to display the national ensign.

35. The following comments address private vessels' obligations in the United States.

36. Vessels may be documented by the federal government, 46 U.S.C. ch. 121, or, for small vessels, by the states under the Federal Boat Safety Act of 1971, Pub. L. No. 92-75, 85 Stat. 213. Either way, they are not required to display, fly or show the American flag. *See generally* 33 C.F.R. Pt. 173; 46 C.F.R. Pt. 67.

37. Federally-documented vessels must have their name and hailing port on the bow and stern in letters not less than four inches in height. 46 C.F.R. § 67.123(d).

38. State-registered vessels are required only to display their state number on the hull, along with a validation sticker or decal located no more than six inches from the number. 33 C.F.R. § 173.35. Such vessels are not required to include a replica of either the United States flag or the flag of the state that issued the Certificate of Number.





39. The state number need be only three inches in height. 33 C.F.R. § 173.27(a); *see generally* U.S. Coast Guard, A Boater's Guide to Federal Requirements for Recreational Boats and Safety Tips, *available at* http://www.uscgboating.org/images/420.PDF, at 5.

40. Under international law and maritime custom and practice, a flag painted above the waterline on the hull of a vessel is sufficient to establish the vessel's flag State.

41. It is my understanding that M/V *El Vacan* had a replica of a national flag affixed to or painted on her hull. If the replica could have been seen by the naked eye or with the assistance of binoculars and its significance understood by a boarding team either at a distance or close up before actually coming aboard the vessel, the boarding violated the law of the sea absent the consent of either the person in charge or flag State authorities, neither of which, as I understand the currently available evidence, was obtained.

42. In my opinion, requiring a vessel such as M/V *El Vacan* to literally "fly" a national flag in order to avoid treatment as a stateless vessel within the meaning of the Convention would exceed anything demanded either by maritime law or federal or state law.

### The Right of Visit

43. UNCLOS Article 110 recognizes a right of visit in five situations, only one of which is applicable here: when a ship is without nationality. "A right-of-visit boarding is warranted when there are no indicators of nationality or when there is clear, articulable evidence indicating that the indicators or claims of nationality are false or misleading." Craig H. Allen, International Law for Seagoing Officers 261 n.229 (Naval Institute Press 6th ed. 2014).

44. Either a vessel bears indicators of nationality or it does not, one such indicator being the display of a national flag. Under Article 110, display must be determined prior to boarding inasmuch as boarding is only authorized under the right of visit *after* a determination has been made that there are no indicators of nationality. Article 110(2) provides that "[i]n the cases provided for in paragraph 1, the warship may *proceed* to verify the ship's right to fly its flag. To this end, it may send a boat under the command of an officer to the suspected ship. . ." (emphasis added). The required sequence is thus clear from the language of the Convention: first determine if there are indicators of nationality; if there are, seek flag

State consent to a right of visit boarding; and only then conduct the actual boarding. The sequence is critical and is directly confirmed by ¶ 8 of the "Operational Procedures for Boarding and Inspecting Vessels Suspected of Illicit Traffic in Narcotic Drugs and Psychotropic Substances and of Smuggling Migrants by Sea" (Operational Procedures), to which the United States and Ecuador have agreed. The plain language of that document prescribes a sequence that begins with (a) an "encounter," and proceeds from there to distinct steps of (b) a request for the apparent flag State's official verification of nationality, (c) confirmation of nationality by the apparent flag State's competent authorities, and only then, (d) "authorization to board and search." Those Procedures are strong evidence of the parties' mutual understanding of the demands of the Convention. (Form 3: Response to Action Request includes an "Authorization by Flag State," which on its face requires flag State authorization before stopping, boarding, or searching.) If this sequence were not followed, every vessel could be boarded for the purpose of going behind any apparent indicators of nationality, without the consent of the apparent flag State. The right of visit exception would swallow the right of navigation rule.

45. Article 110's strict limitations "apply *mutatis mutandis* to military aircraft." Art. 110(4).

46. Whether a vessel bears indicators of nationality can in theory be determined from a helicopter, but the duty to look for such indicators

continues, in my opinion, until the moment of boarding, since that is the heart of the right of *visit*, and in this case the helicopter did not undertake an airborne boarding. Just because an indicator of nationality might not be visible to an observer in a helicopter does not mean it is not reasonably visible for purposes of the right of visit.

47. Sheer distance from M/V *El Vacan* or binocular limitations, available light, weather and sea conditions, wake, or quite simply the size of the indicators of nationality might prevent an observer from seeing a flag for what it was. But until there has been a boarding, there is no *visit*, and nothing prevented USS *Kauffman* from performing a visual inspection from at or near sea level and at close quarters when she maneuvered alongside M/V *El Vacan* with a view to sending a boarding team aboard. Such an approach would have been at slow speed to avoid mishaps such as a collision with or the capsizing of the much smaller vessel, as well as injury to or drowning of persons aboard.

48. While a person looking down from the bridge or rail of USS *Kauffman* might have had difficulty discerning a flag on M/V *El Vacan*'s stern once the vessels were either touching or so close together that a boarding team could jump or step aboard the smaller vessel using the accommodation ladder or some other ladder rigged from *Kauffman*, there would have been no such difficulty as *Kauffman* made her approach.

49. How high in the water USS *Kauffman* was riding at the time of the boarding is unknown, and would be a function of such matters as how much fuel and water she had consumed since her last port call or underway replenishment. That in turn could be a function of whether the boarding occurred at the beginning, middle or end of the patrol.

50. The following image represents the Naval Ship Systems Command's profile of *Perry*-class frigates of the long-hull type (which included USS *Kauffman*). The image is available online at https://upload.wikimedia.org/wikipedia/commons/3/3a/Oliver_Hazard_Perry-class_frigate_%28long_hull%29_outboard_profile.jpg and can be magnified using a standard web browser.



51. The profile reveals that USS *Kauffman*'s main deck was not extraordinarily high above the surface of the water (in contrast to, say, an aircraft carrier), and hence that a person observing M/V *El Vacan* as the vessels drew closer together would, as a matter of simple geometry, have

had ample opportunity to spot even quite a small flag replica on *El Vacan*'s stern. A person stationed on the accommodation ladder platform several feet down from the top of the ladder would be even closer to the surface of the ocean and thus at or very close to horizontal with *El Vacan*'s gunwale. Such an observer would have had an even better opportunity to observe any markings on M/V *El Vacan*'s stern, subject of course to available light and prevailing sea conditions.

52. In order to more fully assess whether the flag was visible by personnel aboard USS *Kauffman* as she approached and drew alongside M/V *El Vacan*, it would be useful to know what lookout arrangements were in place on *Kauffman* at the time of the approach and boarding; who was stationed where among those supervising, participating in or observing the approach and the boarding; and what fixed or portable binoculars were in use and by whom.

53. In my opinion, testing the visibility of indicators of nationality at any time other than in the immediate physical approach that is required to effect a boarding materially erodes Article 110(1) and improperly incentivizes naval and law enforcement personnel of the United States and, importantly, of other countries, to remain ignorant of readily discernible indicators of nationality.

54. *Prado* is inattentive to the fact that States do not in general have authority over vessels of other nationality on the high seas or in other

States' Exclusive Economic Zones. The decision's treatment of the question of size, 2015 U.S. Dist. LEXIS 146254, at *13 ("not remotely large or prominent enough to put a reasonable official on notice"), makes no effort to address the point at which size and prominence – and hence reasonableness of a putative exercise of the right of visit – are to be evaluated. For the reason I have stated, that point is at the time of boarding and not some earlier time where the vessel at issue may be a great distance off and the enforcement unit's ability to conduct a meaningful visual inspection seriously compromised. It would be anomalous to demand larger identifying marks on vessels over which the United States enjoys no general jurisdiction than it demands of private vessels that are in perfect compliance with United States or state law.

### Scuttling

55. M/V *El Vacan* was scuttled (*i.e.*, intentionally sunk) by United States authorities following its boarding, the completion of investigative procedures, and the arrest of the persons who were aboard. The law enforcement case package checklist recites without elaboration: "VESSEL DESTROYED DUE TO NAVIGATION HAZARD."

56. United States law permits the government to destroy privately-owned vessels in very limited circumstances. *E.g.*, 14 U.S.C. § 88(a)(4) (2012); 33 U.S.C. §§ 414(a), 415(a), 1321(c)(1)(B)(iii), 1474(3) (2012); *see generally* U.S. Coast Guard, Commandant Instruction 16465.5, Vessel

Removal/Destruction Under Federal Water Pollution Control Act or Comprehensive Environmental Response Compensation and Liability Act ¶ 5a (Oct. 14, 2011), *available at* https://www.uscg.mil/directives/ci/16000-16999/CI_16465_5.pdf. A vessel that attempts to break free of hot pursuit may be fired at for the purpose of securing compliance with an order to heave to or to prevent escape by disabling her ability to steer, but the intentional destruction of a vessel that has been seized in the course of maritime law enforcement is not provided for. The use of excessive force in maritime law enforcement is strongly disfavored.

57. A stateless vessel that is seized for violation of the domestic law of a State other than its flag State is not subject to summary disposal by sinking, scuttling, being set afire or broken up, or other means.

58. A State whose naval or maritime law enforcement forces seize a stateless vessel does not automatically acquire title to it so as to be empowered to dispose of it in any fashion that suits it, including scuttling. Such a vessel may itself be evidence in legal proceedings, as well of course as the personal property of her owner(s).

59. A stateless vessel is not a naval prize, nor is it subject to forfeiture except as provided by the domestic law of the seizing State. A seizing State may obtain title in that fashion, but until it does, it holds the vessel as a mere custodian, just as it would any other evidence that has been seized for law enforcement purposes.

60. A State whose naval or maritime law enforcement forces seize a stateless vessel has a duty to exercise reasonable care in the circumstances, as would be required of any other official custodian of evidence being held in connection with legal proceedings. The Operational Procedures referred to above require that a State that boards and inspects a vessel "should be responsible for and ensure . . . that: . . . "[t]he vessel and its cargo are not unduly endangered." The default position under this language is that the vessel is to be preserved.

61. The record currently available does not permit a reasoned decision as to whether it was reasonable for United States authorities to scuttle M/V *El Vacan*.

62. Whether the decision to scuttle was reasonable would require consideration of at least the following factors:

a. Was M/V *El Vacan* seaworthy given sea and weather conditions prevailing at the time she was scuttled on April 14, 2015? The file indicates that at the pertinent time seas were running at one foot, wind was 7 knots, visibility was 10 nautical miles, and the forecast was for clear weather. There is no indication of engine or steering problems.

b. Did USS *Kauffman* perform a seaworthiness assessment to determine if the boat could be safely towed to a safe haven, as it did in another case on February 28, 2015, according to an April 10, 2015 press release from U.S. Southern Command titled "USS Kauffman, US Coast Guard,

Royal Canadian Navy team seizes narcotics"? In that case, the scuttled vessel required "aid in dewatering due to a failed bilge pumping system. Detailed assessments determined that the ship posed a significant risk to personnel and that [the] safest course of action was to scuttle the ship as a danger to navigation."

c.  If M/V *El Vacan* was seaworthy, was USS *Kauffman* or any other naval or Coast Guard asset in a position to embark a crew and so provision her with food, water, navigational and communications equipment, and fuel as to permit her to navigate safely under her own power to a port where she could be held pending legal proceedings?

d.  Whether or not M/V *El Vacan* was seaworthy in the sense of being able to navigate safely under her own power to an appropriate port pending legal proceedings, was she seaworthy in the sense that she could have been towed to such a port by USS *Kauffman* or some other naval or Coast Guard asset?

e.  Was USS *Kauffman* configured and equipped so as to be able to tow M/V *El Vacan* into port? A March 2, 2015 U.S. Southern Command press release titled "USS Kauffman saves mariners stranded in Caribbean Sea" reports on a case in which the frigate took a disabled Colombian fishing vessel in tow. "The Deck Division professionally and successfully rigged Kauffman and the fishing vessel for open-ocean tow,

an infrequently practiced task." The *Kauffman* towed the fishing vessel for 130 miles. Seas were up to eight feet.

f. Were there political obstacles to bringing M/V *El Vacan* into the nearest port, and if so, what steps could have been taken to overcome those obstacles, and if they were not taken, why not?

g. Was it possible, given the depth of water at the place of scuttling as well as the actual and anticipated sea and weather conditions, to anchor and appropriately light and mark M/V *El Vacan*, and arrange for commercial towage as an alternative to scuttling?

h. Was it possible, given the depth of water at the place of scuttling as well as the actual and anticipated sea and weather conditions, to affix a line and buoy or other device to M/V *El Vacan* before she was scuttled, thereby permitting her to be located and raised.

i. Given M/V *El Vacan*'s size (9.6 meters or 31.5 feet) and the configuration of USS *Kauffman* and any other naval or Coast Guard assets in the vicinity, was it reasonably possible to take M/V *El Vacan* aboard, rather than scuttling her?

j. Would taking M/V *El Vacan* aboard or in tow or placing a crew aboard her with instructions to navigate to an appropriate port have been materially prejudicial to USS *Kauffman*'s safety or ability to accomplish her operational mission?

k. Was M/V *El Vacan* visited, boarded and scuttled at the beginning, middle or end of USS *Kauffman*'s patrol?

l. Was the patrol during which M/V *El Vacan* was scuttled USS *Kauffman*'s final patrol before decommissioning?

m. What instructions were USS *Kauffman* or U.S. Coast Guard Law Enforcement Detachment (LEDET) 402 provided concerning what to do with vessels determined to be stateless?

n. In addition to the vessel USS *Kauffman* sank on February 28, 2015 "using its organic weapon systems and trained personnel," how many stateless or other non-US flag vessels were scuttled or otherwise destroyed by USS *Kauffman* or LEDET 402 on the patrol in the course of which M/V *El Vacan* was scuttled or on any prior or subsequent law enforcement patrol or deployment.

63. The Court should be fully informed on these matters before rendering a decision as to whether scuttling M/V *El Vacan* was unlawful spoliation.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 2, 2016.

Eugene R. Fidell